IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:13-CV-151-FL

| | | |
|---|---|---|
| KRISTI ELIZABETH RIVERA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-22, DE-24] pursuant to Fed. R. Civ. P. 12(c). Plaintiff Kristi Elizabeth Rivera ("Claimant") filed this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the denial of her applications for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, the undersigned recommends granting Claimant's Motion for Judgment on the Pleadings, denying Defendant's Motion for Judgment on the Pleadings, and remanding this matter to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

## STATEMENT OF THE CASE

Claimant protectively filed an application an application for Title XVI SSI on April 23, 2010. (R. 230-33.) Claimant also filed an application for a Title II period of disability and DIB on May 5, 2010. (R. 234-43.) Both applications alleged a disability beginning June 30, 2006. (R. 230, 236.) Her claims were denied initially and upon reconsideration. (R. 14, 136, 143.) A

hearing before Administrative Law Judge Wanda L. Wright was held on February 16, 2012, at which Claimant was represented by counsel and a vocational expert ("VE") appeared and testified. (R. 14, 34-62.) On April 5, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 14-23.) Claimant then timely requested a review of the ALJ's decision by the Appeals Council on April 24, 2012. (R. 9-10.) After reviewing the record, the Appeals Council denied Claimant's request for review on May 13, 2013. (R. 1-5.) Claimant then commenced the instant action, seeking judicial review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision denying disability benefits under the Social Security Act, 42 U.S.C. §§ 301 *et seq.*, ("Act") is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; [i]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)) (internal quotation marks and citation omitted) (alteration in original). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589) (internal quotation marks omitted) (first and second alterations in original). Rather, in conducting the "substantial evidence" inquiry, the court determines whether the Commissioner has considered all relevant evidence and sufficiently

2

explained the weight accorded to the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

In making a disability determination, the Commissioner utilizes a five-step evaluation process. The Commissioner asks, sequentially, whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1; (4) can perform the requirements of past relevant work; and, if not, (5) based on the claimant's age, work experience and residual functional capacity can adjust to other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *Albright v. Comm'r of the Soc. Sec. Admin.*, 174 F.3d 473, 74 n.2 (4th Cir. 1999). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). At the fifth step, the burden shifts to the Commissioner to show that other work exists in the national economy that the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) failure to give proper weight to the treating psychiatrist's medical opinion (Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings

3

("Pl.'s Mem.") at 2-4); and (2) failure to pose a hypothetical that adequately reflected Claimant's RFC (Pl.'s Mem. at 4-5).

## FACTUAL HISTORY

### I. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found that Claimant was no longer engaged in substantial gainful employment. (R. 16.) Claimant was briefly employed in a variety of positions after the date of alleged onset but the ALJ found that none of the income she received met the monthly requirements for substantial gainful employment in any year since she became disabled. *Id*. Next, the ALJ determined that Claimant had the following severe impairments: bipolar disorder, generalized anxiety disorder, and attention deficit disorder. (R. 17.) At step three, however, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17-18.) Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild to moderate limitations in her activities of daily living, social functioning and concentration, persistence and pace with no episodes of decompensation of extended duration. (*Id*.)

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform a full range of work at all exertional levels with the following non-exertional limitations: "simple, routine, repetitive tasks with no interaction with the general public and only occasional interaction with co-workers and supervisors; and low-stress setting with only occasional decision making and occasional changes in the work setting in a low production rate environment." (R. 18.) In making this assessment, the ALJ found Claimant's statements about

4

her limitations to be partially credible. (R. 18-21.) At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work as a customer service representative. (R. 21.) Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the regional and national economies. (R. 22.)

## II. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was thirty-one years old and unemployed. (R. 31, 56.) Claimant is a high school graduate and began, but did not complete, the basic law enforcement training program at Coastal Carolina University. (R. 38.) Claimant was last employed as a customer service representative for Sam's Club, where she worked approximately three months as a salesperson in the wireless kiosk, setting up new cell phone service and upgrading cell phone service for club members. (R. 39.) Claimant left Sam's Club in October 2011. Claimant explained that the job required her to be upbeat and engaged, behaviors which Claimant was unable to exhibit while under the influence of her anti-anxiety medications, and without the medication she was unable to cope with the work-related stress. (R. 39-40.) Claimant's past work experience also includes previous work as a customer service agent, customer retention representative, restaurant server, technical support representative, restaurant order taker, housekeeper, salesperson, and bookkeeper. (R. 40-44, 403.) Claimant stated that she worked these various jobs for short periods of time and was constantly forced to leave them because of illness or anxiety-related symptoms. (*Id*.)

5

Claimant explained that numerous medical conditions support her disability claim and her inability to work full-time. These medical conditions include general anxiety disorder (R. 45-47, 52-53), bipolar disorder (R. 47-48), and attention deficit disorder (R. 49-50).

Claimant testified she is unable to work because her anxiety disorder causes her to experience panic attacks throughout the day. Claimant states that the anxiety disorder is the most serious of her impairments and affects her day-to-day living the most. (R. 45.) She stated that her panic attacks make her feel like she is being stabbed in the heart and that her ribcage is being crushed. (*Id.*) Claimant testified that her attacks can last anywhere from five to forty-five minutes long. (R. 46.) She takes Valium to help manage her symptoms. (R. 47.) With medication, Claimant says that instead of experiencing ten to twelve attacks a day, she instead experiences four to six. (R. 46.) Claimant stated that she needs to pull over to the side of the road if an attack occurs while she is driving. (R. 46.) She also testified that the attacks are generally random but increase in frequency when she is at a public place or in a stressful situation. (R. 46-47.)

Claimant testified that her bipolar disorder also prevents her from working. She noted that she experiences vast swings in emotional states across different days of the week. (R. 47.) Claimant stated that the depressive states can last as long as a day or two while the manic states tend to last anywhere from a few hours to an entire day. (R. 48.) Specifically, she noted that on some days she has no energy at all, while other days she will be incredibly upbeat. (R. 47-48.) Medication helps to moderate the mood swings but she still experiences them often. (R. 48.) Claimant testified that medication causes her to have trouble sleeping approximately three times a week. (R. 48.)

Claimant testified that she is also prevented from working due to her attention deficit disorder. Claimant stated that she cannot help her children do homework (even elementary school assignments) or do household chores involving multiple steps, such as laundry or cooking, because of her condition. (R. 49.) She testified that she forgets what she is doing on a daily basis and only remembers hours later. (R. 50.) Claimant takes Adderall every day to help combat her ADD. (*Id.*) Claimant stated that her condition has improved as a result of medication. She testified that with medication she is better able to organize bills and complete tasks without losing concentration or becoming disorganized. (*Id.*)

Lastly, Claimant described a number of functional limitations arising from her various ailments. She explained that she struggles to do heavy cleaning around the house, instead relying on her sister-in-law to help her with those chores. (R. 50-51.) Claimant testified that simple tasks, such as grocery shopping, can take as long as four hours because of her anxiety attacks. (R. 52.) She testified that her conditions are so debilitating that if she is not shopping for necessities or attending an event, such as a parent-teacher conference at her children's school, she is at home. (R. 53.) Claimant did note, however, that she is able to provide care for and supervise her younger children, who are two and five years old. (R. 54-55, 57.) She also testified that she did not have the organizational skills necessary to maintain any type of job that requires a structured approach and that her anxieties prevent her from working at anything more strenuous than a relaxed pace. (R. 57-58.)

### III. Vocational Expert's Testimony at the Administrative Hearing

Sue Turner testified as a vocational expert ("VE") at the administrative hearing. (R. 59-61.) The VE first testified about the DOT exertional and skill characteristics of Claimant's past work experience, which met the definitions of bartender, bookkeeper, cashier II, fast food

7

cook, short-order cook, sales clerk, customer service representative, housekeeping, food and beverage order clerk, waitress, and leasing agent. (R. 59-60.) The ALJ then asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant. The ALJ asked whether the individual, with no exertional limitations, could perform Claimant's past relevant work assuming the individual

> is limited to simple routine, repetitive tasks with no interaction with the general public, and only occasional interaction with co-workers and supervisors. The job should be in a low-stress setting, defined as having only occasional decision-making, and occasional changes in the work setting. The job should be in a low production rate environment.

(R. 60.) The VE answered that a person with these limitations could only perform the job of housekeeper from the list of previous relevant jobs described above. (*Id*.) The ALJ then asked whether there were other jobs available in the labor market that the hypothetical individual could perform. (*Id*.) The VE responded that the individual would be able to perform the duties of a marker (DOT # 209.587-034), checker I (DOT # 222.687-010), and garment bagger (DOT # 920.687-018). (R. 61.) Claimant supplemented the hypothetical by adding two restrictions: (1) that the individual's inability to maintain concentration and attention would prevent productive work for at least two hours each day, and (2) that the individual would miss at least three days of work per month. (R. 61.) The VE answered that either of these restrictions would preclude the individual from maintaining competitive employment in the jobs identified. (*Id*.)

## DISCUSSION

### I. Failure to Give Controlling Weight to Treating Physician's Opinion

Claimant first contends that the ALJ failed to assign controlling weight to the opinion of her treating psychiatrist, Dr. Ash Mikhail. (Pl.'s Mem. at 2-4.) Dr. Mikhail opined that Claimant would need to miss more than three days of work every month and noted marked or

8

extreme loss in a number of work-related mental activities, including: ability to understand and remember short and simple instructions, ability to understand detailed instructions, carrying out instructions, maintaining attention for lengthy periods of time, working in coordination and proximity to others, making simple work-related decisions, completing a normal work day or week without interruptions from psychological symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (R. 576-77.) The ALJ assigned "little weight" to Dr. Mikhail's opinion and found that the record did not support his opinions with regard to Claimant's disability. (R. 21.) In support of this finding, the ALJ noted that the record shows Claimant's condition is stable when treated with medication. (*Id*.) Claimant argues that these findings are not supported by substantial evidence and remand is therefore warranted.

Generally, a treating physician's opinion should be accorded greater weight than the opinion of a non-treating physician's opinion, but the court is not required to give the testimony controlling weight in all circumstances. *Mastro*, 270 F.3d at 178. Rather, a treating physician's opinion on the nature and severity of a claimant's impairment is given controlling weight only if it is "supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence on the record." *Id*; *see also* 20 C.F.R. § 404.1527(c)(2). "[B]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (quoting *Craig*, 76 F.3d at 590) (internal quotation marks omitted). Thus, the ALJ has the discretion to give less weight to the treating physician's testimony in the face of contrary evidence. *Id*. "Additionally, the ALJ is not bound by a treating physician's opinion regarding whether a claimant is disabled, as that opinion is reserved for the

9

Commissioner." *Parker v. Astrue*, 792 F. Supp. 2d 886, 894 (E.D.N.C. 2011) (citing 20 C.F.R. § 404.1527(e)(1)).

Claimant's principal argument is that the record does not support the ALJ's finding that Claimant's symptoms were controlled by medication. (Pl.'s Mem. at 2-4.) In support of this contention, Claimant notes that she had her Valium dosage increased, that she regularly had trouble sleeping because of panic attacks and nightmares, and that she continued to suffer from a variety of symptoms such as inability to focus, mood swings, and panic attacks. (Pl.'s Mem. at 3-4.) Given those continued symptoms, Claimant argues that the ALJ's opinion is not supported by substantial evidence.

The ALJ cited Exhibits 8F and 11F as evidence that Claimant's conditions were stable under the effects of medication. (R. 21.) Exhibit 8F contains Claimant's treatment records from Coastal Carolina Neuropsychiatric Center from February 2008 until January 2011 (R. 527-74), while Exhibit 11F includes similar notes from January 2011 until December 2011 (R. 586-96). These notes show that Claimant periodically complained about her symptoms throughout the time she was a patient, while at other times, she described her condition as stable. For example, at some of her visits to the clinic, Claimant described a stable mood and no problems with anxiety attacks. (R. 531, 533, 535, 537, 539, 541, 543, 553, 591-93.) In many instances, however, Claimant reports continued symptoms from her ailments, even while following the prescribed medication regimen. She reported that she continued to experience sleeplessness at night without any identified cause (R. 541, 543, 551-52, 586, 594), and also as a result of panic attacks (R. 527, 545, 595) and nightmares (R. 527, 549, 595). The notes show that her inability to sleep can cause severe morning headaches. (R. 541, 543.) Additionally, while the notes indicate Claimant reported mood stability at some visits (R. 527, 531, 533, 535, 537, 545, 553, 591-94), other visits

10

indicate continued mood swings while on medication for her bipolar disorder (R. 529, 547, 551-52). For example, at one visit Claimant states that the weeks before the appointment had been an emotional roller coaster. (R. 547.) Claimant's complaints of mood swings do not appear to follow any pattern and occurred over a broad period of time between 2010 and 2011.

Claimant's psychiatric records also indicate that in May 2011 Claimant stopped using all medications because she felt her mood swings were the product of situational stressors involving her mother (with whom she lived) and her children. (R. 590.) Five months later, however, Claimant returned to her psychiatrist's office asking to restart her medication regimen. (R. 588-89.) Claimant's chief complaints were of panic attacks, mood swings, and trouble sleeping. (R. 588.) Claimant had also previously complained that medication dosages were too low to effectively combat her symptoms. (R. 551-52.) Claimant reported that she had to double her dosage of Valium in order for it to effectively control her anxiety and that while her Adderall worked, she felt that it wore off too quickly. (R. 551.) As a consequence, Claimant's Valium dosage has been increased and the Adderall prescription was changed to an extended release formula to help combat continued problems with focus.

The continued and inconsistent exhibition of Claimant's major symptoms, along with changes to Claimant's medication, suggest that her conditions may not be as stable as the ALJ found them to be. The ALJ does not specifically cite to any particular record to show that Claimant's condition is stabilized under the influence of her medications. Instead, the ALJ cites to Dr. Mikhail's treatment records, which suggest that Claimant's symptoms are controlled at times while at other times they are not, a state of affairs that hardly meets the definition of "stabilized." Moreover, the ALJ's decision in this regard fails to account for the fact that bipolar disorder, like many mental illnesses, is characterized by "'good days and bad days,' rapid

11

fluctuations in mood, or recurrent cycles of waxing and waning symptoms." *Phillips v. Astrue*, 413 F. App'x 878, 886 (7th Cir. 2010); *see also Daniel v. Astrue*, No. 07-CV-01490-REB, 2008 WL 3833761, at *4 (D.Colo. Aug 13, 2008) (finding an ALJ's determination that a claimant's condition had improved was not supported by substantial evidence where the medical records indicated that her conditions "waxed and waned over time"); *Carey v. Astrue*, No. 4:11-CV-212-FRB, 2012 WL 1033341, at *22 (E.D.Mo. Mar 27, 2012) ("In cases involving mental impairments, recognition must be given to the instability of such conditions and their waxing and waning nature after manifestation.") (citing *Rowland v. Astrue*, 673 F.Supp.2d 902, 920-21 (D.S.D. 2009)). The ALJ made no mention of Claimant's on-again, off-again pattern of symptoms in finding Claimant's conditions to be "stabilized." The ALJ's finding that Claimant's condition was stabilized by her medications, therefore, is not supported by substantial evidence. As that finding was the only reason cited by the ALJ in assigning "little weight" to Dr. Mikhail's opinion, the ALJ failed to properly assess the opinion.

## II.     Hypothetical Question

Claimant next contends that the ALJ asked the VE an improper hypothetical question because it did not include all of her non-exertional limitations. (Pl.'s Mem. at 4-5.) Specifically, Claimant takes issue with the ALJ's failure to include the following limitations noted in Dr. Mikhail's opinion: that Claimant had trouble with maintaining attention and concentration, performing at a consistent pace, responding to criticism from supervisors, and getting along with supervisors. (*See* R. 577-78.)

The purpose of a VE's testimony is to assist the ALJ in determining "whether there is work available in the national economy which this particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The VE's testimony must be in response to hypothetical

12

questions which "fairly set out all of claimant's impairments" after full consideration of all of the evidence in the record. *Id*. at 50-51. In order for the hypotheticals to be proper, they must ensure that the VE knows "what the claimant's abilities and limitations" are. *Id*. at 51. The ALJ is not required, however, to include impairments which he or she does not find to be credible. *See Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (holding that a hypothetical was proper when it included all impairments found by the ALJ). Therefore, where the ALJ does not believe that a claimant is limited by a particular impairment, and substantial evidence supports that decision, the ALJ does not commit reversible error by electing not to include the impairment in hypotheticals posed to the VE. *McPherson v. Astrue*, 605 F.Supp.2d 744, 761 (S.D. W. Va. 2009) ("With regard to the impairments that the ALJ found to be not severe or not credible, the ALJ was not obligated to structure hypothetical questions accounting for these impairments.").

Given the undersigned's recommendation that the case be remanded for further consideration of Dr. Mikhail's opinion and the possibility that the ALJ's RFC determination may be significantly different on remand, the undersigned expresses no opinion whether the ALJ erred in failing to include the limitations noted by Dr. Mikhail in the hypothetical presented to the VE.

## CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-22] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE-24] be DENIED and that the matter be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have fourteen (14) days from the date of service to file written

13

objections. Failure to file timely written objections shall bar an aggrieved party from receiving de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Judge.

This 29th day of July 2014.

*Kimberly A. Swank*
KIMBERLY A. SWANK
United States Magistrate Judge